UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| LISA T. LEBLANC, ET AL. | CIVIL ACTION |
| VERSUS | NO. 12-2059 & CONSOLIDATED CASES |
| TEXAS BRINE CO., LLC, ET AL. | SECTION A(5) |

## ORDER AND REASONS
### [Ref: All Cases]

The following motions are before the Court: **Motion to Stay Pending Arbitration (Rec. Doc. 875)** filed by OXY USA, Inc.; **Motion to Stay Pending Arbitration (Rec. Doc. 877)** filed by Occidental Chemical Corp. ("Occidental"). Texas Brine Co., LLC opposes both motions. The motions are before the Court on the briefs without oral argument.[1] For the reasons that follow, the motions are GRANTED.

---

[1] Occidental filed its initial motion to stay the claims between it and Texas Brine pending arbitration on September 20, 2013. (Rec. Doc. 161). At the parties' request the Court continued the submission date on that motion numerous times so that Occidental and Texas Brine could reach an agreement on the scope of arbitration. The Court ultimately dismissed that motion as moot on March 10, 2015 (Rec. Doc. 510) because by that time Occidental had filed a Re-urged Motion to Stay (Rec. Doc. 470), followed by a second Re-urged Motion to Stay filed on April 21, 2015 (Rec. Doc. 585).

Texas Brine filed its opposition to the re-urged motions to stay on July 21, 2015 (Rec. Docs. 716 & 718). On motion of Occidental, the Court consolidated the re-urged motions to stay for submission on August 12, 2015. (Rec. Doc. 726).

On September 29, 2015, Texas Brine filed its Second Amended Third-Party Demand and Cross-Claim (Rec. Doc. 794), which prompted Occidental and OXY USA, Inc. to file two additional Motions to Stay Pending Arbitration on November 12, 2015 (Rec. Docs. 875 & 877). At the status conference held on February 25, 2016, the Court dismissed the motions to stay filed at documents 470 and 585 as moot (Rec. Doc. 1010), and Texas Brine and Occidental advised the Court that the instant motions to stay filed at documents 875 and 877 were ripe for determination. Since that date Texas Brine has been granted leave to file two additional

## I.    Background[2]

In 1975, Hooker Chemicals & Plastics Corporation, Occidental's predecessor-in-interest, executed a brine mineral lease with Texas Brine Co., LLC. ("Texas Brine") to produce salt on a parcel of land owned in Assumption Parish ("the Salt Land"). The Napoleonville Salt Dome is a naturally occurring geological formation located underground and a portion of the Salt Dome lies beneath the Salt Land. Texas Brine assigned its brine mineral leasehold in the Salt Land to Vulcan Materials Co., n/k/a Legacy Vulcan Corporation, but remained operator, for the account of Vulcan, of the brine production wells and related facilities. This was carried out pursuant to an October 29, 1975, operating and supply agreement between Vulcan and Texas Brine. In 1982, Texas Brine drilled the Oxy Geismar Well #3 on the Salt Land.

In addition to owning the Salt Land, Occidental (or its predecessor Hooker) also owned a tract of adjacent land ("the Oil Land"). In 1983 Occidental leased the Oil Land to Colorado Crude Co. for the purpose of oil and gas exploration and production. The oil and gas mineral lease contained provisions acknowledging the presence of underground salt formations on Occidental's property, and charging the lessee to endeavor not to damage any salt formations on the leased premises. Colorado Crude assigned the lease to other parties, some of whom are joined in this lawsuit as third-party defendants.

---

supplements (Rec. Docs. 1038 & 1039), Occidental has been granted leave to file two additional supplements ( Rec. Docs. 1032 & 1033), and on March 21, 2016, Texas Brine moved for leave to file yet another supplement (Rec. Doc. 1040).

[2] The factual background recited herein derives from Texas Brine's Second Amended Third-Party Demand and Cross Claim (Rec. Doc. 794) filed on September 29, 2015, and to its opposition memorandum  filed on July 21, 2015 (Rec. Doc. 716). None of the statements contained in the factual background are factual findings by the Court.

With Occidental's consent, one of Colorado Crude's assignees directionally drilled an oil well, the Hooker #1 Well, on the Oil Land, the reservoir of which, known as the "Big Hum," was adjacent to the Salt Dome. The Big Hum reservoir and Texas Brine's Oxy Geismar Well #3 shared a common wall.

According to Texas Brine, commencing in 1986, the operators and lessees of the Hooker #1 Well continuously extracted oil and gas from the Big Hum reservoir. The perpetual extraction resulted in the dramatic depressurization of the Hooker #1 Well reservoir creating a powerful differential pressure gradient between the Hooker #1 Well reservoir and the Oxy Geismar Well #3 cavern. Texas Brine alleges that the Hooker #1 Well and/or the Big Hum reservoir breached the Salt Dome on at least one occasion.

On January 1, 2000, Texas Brine and Vulcan executed the Amended and Restated Operating and Supply Agreement, the purpose of which was to amend and restate in its entirety the 1975 agreement between Texas Brine and Vulcan. (Rec. Doc. 875-3, Operating Agreement at 3). Occidental was not originally a party to this agreement but assumed Vulcan's contractual role in light of several corporate acquisitions/mergers in 2005 and 2006. (Rec. Doc. 877-1,Occidental memo at 4; Exhibits 4 & 5). Section 12.10 of the Operating Agreement is the parties' agreement as to arbitration.[3]

---

[3] The arbitration agreement provides in relevant part:

Any dispute, controversy or claim arising out of or relating to this Agreement or the breach, validity or termination thereof shall be finally settled by arbitration. Any dispute, controversy or claim arising out of or relating to any of the other instruments and agreements pertaining to the Leased Premises or the use or operation thereof (or the breach, validity or termination thereof) may be consolidated in one proceeding with any arbitration relating to this Agreement. **The arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association in effect at the time of arbitration ("the Rules"), except as modified herein or by mutual**

The Hooker #1 Well was plugged and abandoned on May 12, 2010. Texas Brine plugged and abandoned the Oxy Geismar Well #3 in the summer of 2011.

On August 3, 2012, a sinkhole appeared on the Salt Dome in the vicinity of the Oxy Geismar Well #3 and the Hooker #1 Well in Assumption Parish. The sinkhole has spawned multiple lawsuits from plaintiffs seeking millions of dollars in damages from defendants like Texas Brine and Occidental. Texas Brine and Occidental have asserted numerous claims against each other. Pursuant to Section 12.10 of the Operating Agreement, Texas Brine and Occidental proceeded to arbitration to litigate their claims. That arbitration, initiated by Texas Brine on August 2, 2013, is ongoing.

Occidental filed its two Motions to Stay Pending Arbitration because Texas Brine and Occidental have reached an impasse as to the scope of the claims that are subject to arbitration and as to which Occidental entities have standing to demand arbitration. The Court addresses each issue in turn.

## II.    Discussion

### A.

The first point of contention between Occidental and Texas Brine pertains to the scope of the claims that are subject to their arbitration agreement. As explained above, Texas Brine has asserted various non-contractual claims against Occidental based on its contention that the drilling and operations of the Hooker #1 Well caused the sinkhole. Occidental's position is that all of Texas Brine's sinkhole-related claims either arise from or relate to the Operating Agreement, or if not that particular contract, to one of the

---

*agreement of the parties. The arbitration shall be governed by the U.S. Federal Arbitration Act.*

(Rec. Doc. 875-3 Exhibit 1 at 38, Operating Agreement § 12.10(a) (emphasis added)).

many other contractual agreements that Texas Brine had with either Occidental or one of its affiliates, and therefore should be arbitrated along with the parties' other claims.[4]

According to Texas Brine, its non-contractual claims against Occidental do not arise under the Operating Agreement, and Texas Brine's position is that its Hooker #1 Well claims do not even *relate to* the Operating Agreement, thereby removing the claims from the scope of the parties' arbitration agreement. Texas Brine contends that its claims against Occidental for its role in the drilling and monitoring of the Hooker #1 Well should be decided in a court, not as a part of the parties' arbitration.

Perhaps even more important, however, is the threshold legal question of who— the Court or the panel of arbitrators—resolves the foregoing competing contentions to decide the issue of arbitrability, *i.e.*, whether Texas Brine's Hooker #1 Well claims fall within the scope of the parties' arbitration agreement. Occidental argues that under the clear law of this circuit the panel rather than the Court must determine the arbitrability of the claims. Texas Brine, on the other hand, argues that Occidental's contention that the arbitrators must decide arbitrability has been rejected by the state courts in Louisiana, and the question whether Texas Brine must arbitrate its Hooker #1 Well claims is to be decided by the court not the arbitrators. (Rec. Docs. 1038 & 1039, Texas Brine's Supplemental Response at 1).

A two-step analysis is applied to determine whether a party may be compelled to arbitrate a claim. *Sherer v. Green Tree Serv., LLC*, 548 F.3d 379, 381 (5th Cir. 2008)

---

[4] Occidental explains that by consent Occidental and Texas Brine had agreed to stay the claims that had been asserted between them before Texas Brine amended its complaint to assert the Hooker #1 Well claims. (Rec. Doc. 735, Occidental Reply at 1).

(citing *JP Morgan Chase & Co. v. Conegie*, 492 F.3d 596, 598 (5th Cir. 2007)). The first inquiry is whether the party has agreed to arbitrate the dispute. *Id.* If so, then the second inquiry is whether any federal statute or policy renders the claim nonarbitrable.[5] *Id.*

The first inquiry itself contains two questions: 1) is there a valid agreement to arbitrate between the parties, and 2) does the dispute fall within the scope of the arbitration agreement. *Id.*; *Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 214 (5th Cir. 2003) (citing *Am. Heritage Life Ins. Co. v. Lang*, 321 F.3d 533, 538 (5th Cir. 2003)). Courts apply the federal policy favoring arbitration when addressing ambiguities regarding whether a question falls within an arbitration agreement's scope but not when determining whether a valid arbitration agreement exists. *Sherer,* 548 F.3d at 381 (citing *Fleetwood Enters., Inc. v. Gaskamp*, 280 F.3d 1069, 1073-74 & n.5 (5th Cir. 2002)). The question whether an agreement to arbitrate exists is determined by ordinary state law contract formation principles. *Will-Drill*, 352 F.3d at 214 (citing *Fleetwood*, 280 F.3d at 1073).

In *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995), the Supreme Court clarified that the question of who—court or arbitrator—has the primary authority to decide questions of arbitrability is a matter of contract governed by the parties' arbitration agreement. Thus, state law contract principles apply to the question whether the parties agreed to arbitrate arbitrability. *Id.* at 944. Importantly, however, a court should not assume that the parties agreed to arbitrate arbitrability unless there is "clear and unmistakable" evidence that they did so. *Id.* (quoting *AT&T Tech., Inc. v. Commun. Workers*, 475 U.S. 643, 649 (1986)). Further, the law treats silence or

---

[5] Texas Brine has not identified any statute or policy that militates against arbitration.

ambiguity about the question "*who* (primarily) should decide arbitrability" differently from the way it treats silence or ambiguity about the question "*whether* a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement" for in respect to this latter question the law reverses the presumption. *First Options*, 514 U.S. at 944-45 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985)).

In analyzing the pith of the *First Options* decision, the Fifth Circuit has explained that courts are presumed to have plenary power to decide the gateway question of a dispute's "arbitrability." *Houston Refining, LP v. United Steel*, 765 F.3d 396, 408 (5th Cir. 2014) (quoting *First Options*, 514 U.S. at 942). But like any other disputed issue, even the gateway question of arbitrability can be given to an arbitrator, if the parties so choose. *Id.* The party contending that an arbitrator has authority to decide arbitrability "bears the burden of demonstrating clearly and unmistakably that the parties agreed to have the arbitrator decide that threshold question." *Id.* (quoting *ConocoPhillips, Inc. v. Local 13-0555 United Steelworkers Int'l Union*, 741 F.3d 627, 630 (5th Cir. 2014)). If the party cannot carry its burden then the court must independently decide the arbitrability question "just as it would decide any other question that the parties did not submit to arbitration." *Id.*

Applying the foregoing principles, it is undisputed that Texas Brine and Occidental have between them a valid arbitration agreement in Section 12.10 of the Operating Agreement. Texas Brine and Occidental's arbitration agreement expressly provides that "[t]he arbitration shall be conducted in accordance with the Commercial Arbitration Rules of the American Arbitration Association in effect at the time of

arbitration." Rule 7(a) of the AAA Commercial Rules provides that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, ***including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim***." See note 3, *supra* (emphasis added). Under the law in this circuit, an arbitration agreement need not recite verbatim that "the parties agree to arbitrate arbitrability" in order to manifest a "clear and unmistakable" agreement as to that issue. *Houston Refining*, 765 F.3d at 410 n.28 (quoting *Petrofac, Inc. v. DynMcDermott Petro. Opers.*, 687 F.3d 671, 675 (5th Cir. 2012)). Incorporating the rules of the American Arbitration Association is sufficient. *Crawford Prof. Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 262-63 (5th Cir. 2014) (citing *Petrofac*, 687 F.3d at 675). Therefore, Occidental has met its burden of establishing the parties' clear and unmistakable intent to arbitrate the issue of arbitrability.

Texas Brine's argument before this Court elides the question of intent to arbitrate arbitrability from the analysis and instead focuses almost exclusively on whether the Hooker #1 Well claims fall within the scope of the Operating Agreement's arbitration section. To be sure, Texas Brine's better argument does lie with questioning whether its Hooker #1 Well claims are arbitrable because the decisional law in this circuit allows it no colorable argument to make as to why arbitrability must be decided by a court instead of the arbitrators. The error in having a court proceed directly to arbitrability in this case is demonstrated by *Douglas v. Regions Bank*, 757 F.3d 460 (5th Cir. 2014).

In *Douglas*, the plaintiff opened a checking account with a bank and signed a signature card binding her to arbitration. The arbitration provision included a clause

delegating the question of a dispute's arbitrability to an arbitrator. The account was closed less than a year later without incident. *Id.* at 461.

Several years later the plaintiff settled a personal injury lawsuit and the attorney that she hired maintained accounts at the bank. The settlement funds were deposited with the bank pending court approval of the settlement but the attorney embezzled the funds. Plaintiff sued the bank in tort on the ground that the bank had notice of the attorney's fraudulent activity yet failed to take reasonable steps to stop it. The bank, relying on the arbitration agreement associated with the plaintiff's long defunct account, moved to compel her to arbitrate her claims. *Id.*

The district court denied the bank's motion to compel arbitration and the Fifth Circuit affirmed. *Douglas*, 757 F.3d at 461. Writing for the majority, Judge Smith began by recognizing that an arbitration agreement between the plaintiff and the bank did exist because of the signature card that she had signed many years before. Moreover, the arbitration agreement had a delegation provision requiring the parties to arbitrate arbitrability. The panel majority reasoned, however, that the mere existence of a delegation provision in the defunct checking account's arbitration agreement could not possibly bind the plaintiff to arbitrate arbitrability in all *future* disputes no matter their origin. *Id.* at 462. In allowing the plaintiff to escape having to arbitrate arbitrability the panel majority recognized a distinction between situations where the argument as to arbitrability is wholly groundless, and situations where plausible arguments can be made both in favor of and against arbitrability. *Id.* at 463-64 (citing *Qualcomm, Inc. v. Nokia Corp.*, 466 F.3d 1366, 1371 (Fed. Cir. 2006)). Because the bank was relying on a delegation provision in a contract completely unrelated to the present dispute, its

position was wholly groundless and its motion to force the plaintiff to arbitrate arbitrability was correctly denied. *Id.* at 464.

Judge Dennis dissented, taking issue not with whether the dispute itself was actually arbitrable but rather with the majority's adoption of a new "wholly groundless" exception to allow Douglas to avoid having to arbitrate arbitrability. *Douglas*, 757 F.3d at 465-66 (Dennis, J., dissenting). Judge Dennis explained why he believed that the majority's usurpation of the arbitrability decision was contrary to this circuit's and the Supreme Court's precedents that call for the arbitrator to determine arbitrability in a situation like Douglas's. *Id.* at 467-68.

Viewing Occidental's and Texas Brine's competing arguments as to the Hooker #1 Well claims through the prism of *Douglas* reveals the error of Texas Brine's position regarding the question of who must decide arbitrability in this case. The majority opinion and Judge Dennis's dissent both grapple with the situation where a current dispute is ostensibly unrelated to a prior, years-old arbitration agreement. Obviously, Judge Dennis would find that Texas Brine must arbitrate arbitrability without exception regardless of how unrelated its current tort claims appear to be to the Operating Agreement. But even under the more forgiving and perhaps more pragmatic approach adopted by Judge Smith in the majority opinion, Texas Brine cannot avoid having the panel of arbitrators determine arbitrability in this case because Occidental's arguments as to arbitrability are not wholly groundless. This is particularly true when one considers that the arbitration agreement is broadly worded, and that the strong federal policy favoring arbitration factors into the analysis. In other words, this case presents a situation where plausible arguments can be made both in favor of and against

arbitrability. Therefore, because Texas Brine and Occidental have agreed to arbitrate arbitrability, the panel of arbitrators will determine whether Texas Brine's Hooker #1 Well claims fall within the scope of Section 12.10 of the Operating Agreement. [6]

Occidental has moved the Court to stay all claims between Texas Brine and Occidental until the arbitration has ended or until the panel of arbitrators has determined that certain claims are not arbitrable. (Rec. Doc. 877-1, Occidental memo at 10). On September 16, 2015, the panel of arbitrators determined that Texas Brine's Hooker #1 Well claims against Occidental are arbitrable. (Rec. Doc. 845-4 SEALED Exhibit 2). Therefore, the motion to stay (Rec. Doc. 877) is GRANTED as to Texas Brine's Hooker #1 Well claims against Occidental.

## B.

In addition to Occidental, Texas Brine has asserted Hooker #1 Well claims against OXY USA, Inc., Basic Chemical Co., and Occidental VCM. These Occidental affiliates seek to force Texas Brine to arbitrate its claims against them. Thus, the second point of contention between Occidental and Texas Brine pertains to the issue of which

---

[6] Texas Brine relies heavily on its success in the state court litigation in persuading the presiding judges to rule in its favor on the arbitrability issue, which implicitly means that those judges concluded that a court and not a panel of arbitrators should determine arbitrability. As the parties know, this Court has been inclined to defer to the state court judges whenever issues of state law are involved because the parties' causes of action are governed by state law and this Court is exercising diversity jurisdiction. But the question of arbitrability in this case is governed by federal law, not state law. (Rec. Doc. 875-3 Exhibit 1 at 38, Operating Agreement § 12.9 ("Governing Law. This Agreement and the legal relationships of the parties hereunder **shall be construed by and in accordance with the laws of the United States** and, to the extent not inconsistent therewith, the laws of the State of Louisiana . . . .) (emphasis in italics and bold added)). The Court is not saying that it disagrees with either Texas Brine's arguments as to arbitrability or the state court judges' decisions on the issue, *see Ford v. Nylcare Health Plans of the Gulf Coast*, 141 F.3d 243, 250 n.7 (5th Cir. 1998) (explaining that a tort claim is "related to" the agreement only if reference to the agreement is required to maintain the action), but federal law could not be clearer in that arbitrability must be decided by the arbitrators.

Occidental entities have standing to compel Texas Brine to arbitrate its claims against them based on Section 12.10 of the Operating Agreement.

**i.**

The Court begins with OXY USA because this entity was never a party to the Operating Agreement. The question then is whether a non-signatory to an agreement containing an arbitration clause may compel a signatory to that agreement to arbitrate its claim. Thus, the arbitration analysis as to OXY USA begins with the question whether there is or was a valid agreement to arbitrate between the parties—a question that was not at issue with respect to the Occidental/Texas Brine dispute. This inquiry is one for the Court to decide, not the arbitrators. *Auto Parts Manuf. Miss., Inc. v. King Constr. of Houston, LLC*, 782 F.3d 186, 198 (5th Cir. 2015); *DK Joint Venture 1 v. Weyand*, 649 F.3d 310, 317 (5th Cir. 2011). Moreover, the question whether the parties have a valid agreement to arbitrate is one strictly of contract, governed by state law, without the aid of any federally-imposed presumptions favoring arbitration.[7] *Crawford*, 748 F.3d at 257 (citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630-32 (2009)).

---

[7] OXY USA relies on the Operating Agreement's express choice of law provision found in Section 12.9 of the Operating Agreement to urge the Court to apply federal substantive law to the standing analysis. (Rec. Doc. 875-1 at 4). Texas Brine's arguments are also based on federal cases without regard to questions of state law. The Court would be remiss, however, if it did not point out that the Fifth Circuit's *Crawford* decision held that the issue of equitable estoppel as to a non-signatory is a question of state contract law not federal law. 748 F.3d at 257. *Crawford* did not suggest that parties could not expressly choose federal law to govern their arbitration agreement but Judge Dennis, writing for the panel, expressly noted that in light of the Supreme Court's decision in *Arthur Andersen*, all prior decisions allowing non-signatories to compel arbitration based on federal common law, rather than state contract law, including *Grigson*, have been "modified." *Crawford*, 748 F.3d at 261-62. So, it is unclear what remains of the federal common law that both parties relied upon in their briefing to this Court. The Court notes, however, that at least one Louisiana appellate court has expressly agreed with *Grigson* and the ability of a court to apply equitable estoppel when the petition alleges substantially interdependent and concerted misconduct. *Saavedra v. Dealmaker Dev., LLC*, 8 So. 3d 758, 764 n.5 (La. App. 4th Cir. 2009) (citing *Grigson*, 210 F.3d at 527).

OXY USA posits three arguments in support of its contention that it has standing to rely on Section 12.10 of the Operating Agreement to force Texas Brine to arbitrate its Hooker #1 Well claims. First, OXY USA argues that Texas Brine is equitably estopped from avoiding arbitration because its claims against OXY USA are virtually identical to the claims against Occidental that are proceeding in the arbitration. Second, OXY USA argues that Texas Brine's claims against OXY USA rely on the Operating Agreement. Third, Texas Brine must arbitrate its claims against OXY USA because Texas Brine alleges that OXY USA was acting as agent for Occidental, which is a party to the Operating Agreement. (Rec. Doc. 875-1, OXY USA Memo at 3-4).

In opposition, Texas Brine argues *inter alia* that OXY USA's arguments are contrary to the law in this circuit and rely on inapposite cases.

In *Grigson v. Creative Artists Agency, LLC*, 210 F.3d 524, 527 (5th Cir. 2000), the Fifth Circuit decided as a matter of first impression that the principle of equitable estoppel gives a district court discretion to allow a non-signatory to a contract with an arbitration clause to compel arbitration when the action is intertwined with, and dependent upon, that contract. Each case turns on its facts but the linchpin of equitable estoppel is equity or fairness. *Id.* at 527-28. Thus, equitable estoppel may be appropriate when a signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the non-signatory. When each of a signatory's claims against a non-signatory makes reference to or presumes the existence of the written agreement, the signatory's claims arise out of and relate directly to the written agreement, and arbitration is appropriate. *Id.* (quoting

*MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999)). Also, equitable estoppel may be appropriate when the signatory to the contract containing the arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the non-signatory and one or more of the signatories to the contract. *Id.* The "intertwined claims" doctrine comprises the foregoing independent bases for equitable estoppel and estoppel will be much more readily applicable when the case presents *both* bases. *Id.* at 527-28.

The specter of equitable estoppel notwithstanding an arbitration agreement can be invoked by a non-signatory only in "rare circumstances." *Weingarten Realty Invest. v. Miller*, 661 F.3d 904, 912 (5th Cir. 2011) (quoting *Westmoreland v. Sadoux*, 299 F.3d 462, 465 (5th Cir. 2002) ("[W]e are wary of choices imposed after the bargain has long since been struck.")). When the signatory's claims rely on the terms of the written agreement or when its claims arise out of and relate directly to the agreement, notions of fairness come into play. *Id.* (quoting *Grigson*, 210 F.3d at 527). In other words, it would be unfair to allow a signatory to hold the non-signatory liable pursuant to the duties imposed by the agreement (which contains the arbitration clause) only to turn around and deny the arbitration clause's applicability because the defendant is a non-signatory. *Id.*

Finally, a non-signatory cannot compel arbitration solely because he is an agent of one of the signatories. *Westmoreland*, 229 F.3d at 466. An agent seeking to compel arbitration based on his principal's contract is subject to the same equitable estoppel framework left to any other non-signatory. *Id.* at 467.

OXY USA argues that equitable estoppel is appropriate because Texas Brine has alleged what amounts to substantially interdependent and concerted misconduct by both Occidental and OXY USA.[8] Texas Brine argues that it has not alleged a civil conspiracy between OXY USA and Occidental, or that their conduct was "concerted" or "interdependent." Texas Brine points out that equitable estoppel is only "rarely" appropriate under the law in this circuit.

Neither federal law nor Louisiana law requires allegations of civil conspiracy or express use of the terms "concerted" or "interdependent." In this case, Texas Brine accuses both OXY USA and Occidental of tortious conduct or "misconduct" related to the Hooker #1 Well. Texas Brine carefully pleaded its claims against the separate entities but it remains that the various tortious acts are not wholly separate and apart

---

[8] Occidental actually argues that equitable estoppel is appropriate under both aspects of the "intertwined claims" doctrine because Texas Brine's Hooker #1 Well claims "rely" on the Operating Agreement. Occidental's argument on this point is based on a construction of "rely" that is not supported by any decisional law pertaining to equitable estoppel. Texas Brine has sued OXY USA for negligence and *violations of other duties imposed by state law* for its role in the drilling and production associated with the Hooker #1 Well. These claims can be resolved without reference to the terms of the Operating Agreement. None of the duties upon which Texas Brine's claims are based derive from the Operating Agreement. Tellingly, Occidental's briefing as to this issue includes no cites to any part of the Operating Agreement. Occidental's argument that Texas Brine must "rely" on the Operating Agreement for its Hooker #1 Well claims boils down to the fact that Texas Brine wouldn't have been operating on the Salt Land in the first place if it were not for the Operating Agreement. According to Occidental, the only means by which Texas Brine had control of the Oxy Geismar Well #3 and its cavern were through its contracts with Occidental. This type of *but for* argument has previously been rejected at least once in this circuit. *See Weingarten Realty*, 661 F.3d at 912-13 (recognizing that a guarantor's agreement did not "depend on" the loan agreement itself for purposes of equitable estoppel). And it certainly does not provide the type of reliance present in cases that found equitable estoppel to apply. *See, e.g., Wash. Mut. Finance Grp., LLC v. Bailey*, 364 F.3d 260, 267-68 (5th Cir. 2004) (finding equitable estoppel appropriate when plaintiff sued on rights created by the agreement itself); *Grigson*, 210 F.3d at 529 (explaining that a comparison of the complaint and the agreement demonstrated that the claims were dependent upon the agreement); *Palmer*, 254 Fed. Appx. At 432 ("While the [agreement] may play a role in the ultimate outcome of this suit, it is not a part of the Plaintiffs' causes of action.")

from each other. Occidental delegated certain of its duties related to the Hooker #1 Well to OXY USA as its agent, or so Texas Brine alleges, and while agency alone is not sufficient to confer standing on OXY USA, the Court need not ignore this factor in its analysis. In light of the complex types of tortious claims alleged, it is nearly impossible to differentiate where one entity's fault would begin and another's would end. The Court is persuaded that the allegations of misconduct against Occidental and OXY USA in this case are no less "concerted" or "interdependent" than those made in the many cases where equitable estoppel was deemed to be appropriate, notwithstanding the "rare" nature of the remedy. *See, e.g., Griffin v. ABN Mortgage Grp., Inc.*, 378 Fed. Appx. 437 (5th Cir. 2010) (unpublished); *Brown v. Pac. Life Ins. Co.*, 462 F.3d 384 (5th Cir. 2006); *Ford Motor Co. v. Ables*, 207 Fed. Appx. 443 (5th Cir. 2006) (unpublished); *Jureczki v. Bank One*, 75 Fed. Appx. 272 (5th Cir. 2003) (unpublished); *cf. Palmer Ventures LLC v. Deutsche Bank AG*, 254 Fed. Appx. 426 (5th Cir. 2007) (unpublished) (finding equitable estoppel inappropriate because only the signatory was accused of misconduct).

Having found that Texas Brine has alleged concerted and interdependent misconduct against OXY USA and Occidental, the question of the requested stay falls to the exercise of this Court's sound discretion. *See Auto Parts Manuf.*, 782 F.3d at 198. This Court is persuaded that the stay is appropriate under the circumstances. Texas Brine and Occidental have been in arbitration since September 2013 and the arbitration is ongoing. The panel of arbitrators has determined that Texas Brine's Hooker #1 Well claims against Occidental are arbitrable, and Texas Brine has made nearly identical claims against OXY USA. The arbitration proceedings against the two signatories, Occidental and Texas Brine, would be rendered meaningless and the federal policy in

favor of arbitration effectively thwarted if the Court were to allow Texas Brine to piecemeal the claims. *Grigson*, 210 F.3d at 527 (quoting *MS Dealer Serv.*, 177 F.3d at 947); *Sam Reisfeld & Son Import co. v. Eteco*, 530 F.2d 679, 681 (5th Cir. 1976). Moreover, the party resisting arbitration in this case, Texas Brine, is a signatory to the Operating Agreement.

For the foregoing reasons, the motion to stay (Rec. Doc. 875) is GRANTED as to Texas Brine's Hooker #1 Well claims against OXY USA.

### ii.

Occidental's final request for relief is for the Court to stay Texas Brine's Hooker #1 Well claims against Occidental affiliates Basic Chemical Company, LLC ("Basic") and Occidental VCM, LLC ("VCM"). Occidental's argument with respect to these two entities is that they no longer exist. In 2005, Basic acquired Vulcan's interest in the Operating Agreement. Basic assigned its interest in the lease to VCM in 2006, and both Basic and VCM subsequently merged into Occidental. Occidental argues that its claims against Basic and VCM are the same as the Hooker #1 Well claims that it has asserted against Occidental, claims that the arbitrators have now determined to be arbitrable.

In opposition, Texas Brine challenges Occidental's standing to even file the instant motion on behalf of Basic and VCM, given that Occidental has never stipulated that it has assumed the liabilities of these entities in light of the mergers. Texas Brine points out that this Court has previously held that Texas Brine could maintain claims against Basic and VCM because Occidental refused to acknowledge assumption of liability.

The Court is persuaded that the same reasoning regarding interdependent and concerted misconduct explained above with respect to OXY USA applies to Basic and VCM. In fact, the case for a stay is even stronger for these entitles, extant or not, because it appears that at times they were parties to the Operating Agreement under various assignments. In other words, their status as a "signatory" is like that of Occidental's, who was not an original party to the Operating Agreement. The motion to stay (Rec. Doc. 877) is GRANTED as to Texas Brine's Hooker #1 Well claims against Basic and VCM.

Accordingly, and for the foregoing reasons;

**IT IS ORDERED** that the **Motion to Stay Pending Arbitration (Rec. Doc. 875)** filed by OXY USA, Inc. and **Motion to Stay Pending Arbitration (Rec. Doc. 877)** filed by Occidental Chemical Corp. are **GRANTED**. The Hooker #1 Well claims by Texas Brine against Occidental Chemical, OXY USA, Basic Chemical Company, LLC, and Occidental VCM, LLC are **STAYED** until such time that the panel of arbitrators determines that the claims are not arbitrable.

May 9, 2016

_____
JUDGE JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE