UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

LISA T. LEBLANC, ET AL.                                    CIVIL ACTION

VERSUS                                                     NUMBER: 12-2059
                                                                AND CON. CASES

TEXAS BRINE COMPANY, LLC, ET AL.                           SECTION: "A"(5)

## ORDER AND REASONS

Before the Court is the "Motion to Quash Subpoenas Duces Tecum" filed by Defendant, Texas Brine Company, LLC ("TBC"). (Rec. doc. 2124). Third-Party Defendant, Legacy Vulcan, LLC ("Vulcan") filed an opposition memorandum (rec. doc. 2156) and the Court granted leave for TBC to file a reply memorandum. (Rec. doc. 2169). The Court heard oral argument on the motion on September 25, 2019, at which time it ordered supplemental briefing by the parties. (Rec. doc. 2167). That briefing is complete. (Rec. docs. 2172 and 2176). Having thoroughly considered the facts, the law, and the parties' arguments, the Court denies the motion for the following reasons.

I. **THE RELEVANT FACTUAL AND PROCEDURAL BACKGROUND**

This consolidated litigation arises out of a significant sinkhole event near Bayou Corne in Assumption Parish, Louisiana in August of 2012. Following the appearance of the sinkhole, the Louisiana Department of Natural Resources issued multiple directives obligating TBC to undertake environmental remediation of the land where the sinkhole formed. These directives required TBC to, among other things, assist in the evacuation of residents and monitor water quality and pressures. TBC claims that, in complying with these directives, it incurred more than $106 million in remediation expenses. (Rec. doc. 2169).

In the years following the sinkhole's appearance, TBC sought reimbursement of these expenses (including its attorneys' fees) from two of its insurers, Zurich American Insurance Company ("Zurich") and Allied World Assurance Company (U.S.) Inc. ("AWAC"). Zurich is one of TBC's liability insurers and AWAC is a pollution liability insurer. (Rec. doc. 2124-1). To help assess the reasonableness of TBC's reimbursement submissions, Zurich retained the Vertex Companies, Inc. of Delaware ("Vertex") and AWAC retained Hydro-Environmental Technologies, Inc. ("HETI"). (*Id.*). Vertex's and HETI's respective analyses as to the reasonableness of TBC's submissions were reflected in what the parties have termed "Cost Review Reports." (Rec. doc. 2156 at p. 5).

Upon their completion, the Cost Review Reports were sent by Vertex and HETI to their respective clients, Zurich and AWAC, who then forwarded them to Bruce Martin ("Martin"), the Director of Operations of TBC. (Rec. doc. 2170 (transcript) at pp. 13-15). Martin, who is not an attorney, "eventually" sent them to TBC's litigation counsel. (*Id.* at p. 15).

In 2013, TBC filed a third-party demand against Vulcan, seeking, among other things, to recover its costs incurred "to reduce or mitigate damage to all third-party property owners" impacted by the sinkhole. (Rec. doc. 2156 at p. 2). It is undisputed that some or all of the costs that are subject of the Vertex and HETI reports submitted to Zurich and AWAC for reimbursement by Texas Brine are <u>also</u> being sought by TBC in its third-party claim against Vulcan. (Rec. doc. 2170 at pp. 2-3).

According to Vulcan, beginning in 2015 and continuing into 2018, TBC routinely produced copies of the Vertex and HETI reports to Vulcan as part of the "damages" discovery in this litigation. (*Id.* at pp. 23-24). In an affidavit of counsel attached to its supplemental

2

brief, TBC states that it produced 426 such reports to Vulcan (rec. doc. 2172-1 at p. 4), which Vulcan explains were the subject of 23 separate productions. (Rec. doc. 2176 at p. 1).

The subpoenas at issue here were served upon Vertex and HETI, each seeking ""[a]ll final [adjustment] reports (including any exhibits, appendices, or attached materials) regarding expenses incurred by Texas Brine Company, LLC related to the sinkhole near Bayou Corne in Assumption Parish, Louisiana, which emerged on or about August 3, 2012." (Rec. doc. 2156). Vulcan explained in its opposition memorandum that it issued the subpoenas when TBC would not confirm its counsel's oral requests for confirmation that all of the Cost Review Reports had been produced. (Rec. doc. 2170 at p. 21). TBC filed the present motion to quash the subpoenas and thereafter clawed back the 426 reports it had voluntarily produced to Vulcan since 2015. (Rec. doc. 2169).[1]

## II. THE PARTIES' RESPECTIVE POSITIONS

Texas Brine's primary argument is that:

> [b]ecause Texas Brine, Zurich, and AWAC share a common interest in minimizing Texas Brine's liability and the magnitude of claimants' alleged damages against it, documents exchanged between Zurich's representative and Vertex and documents exchanged between AWAC's representative and HETI are subject to the "common interest" privilege codified in article 506(B)(3) of the Louisiana Code of Evidence, and thus, are immune from disclosure.

(Rec. doc. 2124-1 at p. 3).

Texas Brine argues that "by its terms," Article 506(B)(3) "protects communications among Texas Brine, AWAC, Zurich, and their consultants, as all parties share a 'common interest' in reducing Texas Brine's liability in the various sinkhole-related lawsuits." (*Id.* at p. 5).

---

[1] The documents clawed back by TBC are reflected in a 63-page privilege log, attached to TBC's reply brief as an exhibit. (Rec. doc. 2169-1).

Admittedly, TBC is unable to point to a single case that so construes Article 506(B)(3) in these factual circumstances, so it relies on a handful of decisions of other states' courts.

Alternatively, TBC argues that courts "from around the country" hold that communications between insureds and their insurers are subject to both the common-interest and work-product privileges.

In response, Vulcan argues initially that the subject reports are not subject to any privilege. As to the claim of work-product protection, it submits that TBC failed to establish that anticipation of litigation was the "primary motivating purpose" behind creation of the reports, as required by United States Fifth Circuit Court of Appeals precedent. Similarly as to the claim of attorney-client privilege, Vulcan argues that TBC has failed to establish that the subject reports were created for the purpose of giving or obtaining legal advice, that they were confidential, or that they were exchanged only between persons necessary for the rendition of legal services. Finally, as to the common-interest privilege, Vulcan argues that Article 506(B)(3) does not create an independent basis for such a privilege, *i.e.*, the common-interest privilege is derivative of the attorney-client privilege. And because there is no attorney-client privilege, Vulcan claims, there can be no common-interest privilege. Vulcan also complains that the common interest TBC claims is far too vague to support its claims.

Finally, Vulcan argues that the disclosure of all or of a subset of the reports (the 426 voluntarily produced throughout the litigation by TBC) waives any privilege that might have attached to the remainder of the reports.[2] At the hearing on the matter, the Court ordered TBC to address this waiver argument in a supplemental brief, which it did. (Rec. doc. 2172).

---

[2] Vulcan also argues that TBC lacks standing to object to the subpoenas, an argument the Court easily dismisses, given that TBC is arguing that it is the holder of a common-interest privilege in the documents subject of the subpoena.

In that brief, TBC urges the Court to undertake the five-factor analysis set forth in *Alldread v. City of Grenada*[3] to determine "whether there has been an 'inadvertent disclosure'" in this case. (*Id.*).

### III. LAW AND ANALYSIS

#### A. *Whether the "Common-Interest" Privilege Applies to These Documents*

As noted above, TBC's primary argument is that the Cost Review Reports are protected from disclosure by operation of the "common-interest" privilege, which is codified in Article 506(B)(3) of the Louisiana Code of Evidence.[4] The relevant language of Article 506(B)(3) is:

> A client has a privilege to refuse to disclose, and to prevent another person from disclosing, <u>a confidential communication</u>, whether oral, written, or otherwise, <u>made for the purpose of facilitating the rendition of professional legal services to the client</u> . . . when the communication is:
> . . .
> (3) By the client or his lawyer, or a representative of either<u>, to a lawyer, or representative of a lawyer</u>, who represents another party concerning a matter of common interest.
>
> La. Code Evid. Art 506(B)(3)<br>(emphasis added).

TBC claims that "[b]y its terms, Article 506(B)(3) protects communications among Texas Brine, AWAC, Zurich, and their consultants, as all parties share a 'common interest' in reducing Texas Brine's liability in the various sinkhole-related lawsuits." (Rec. doc. 2124-1

---

[3] 988 F.2d 1425 (5th Cir. 1993).
[4] Under Rule 501 of the Federal Rules of Evidence, because the basis of this Court's jurisdiction over this matter is diversity of citizenship, the Court must apply Louisiana's law on attorney-client privilege. *Dunn v. State Farm Fire & Casualty Co.*, 927 F.2d 869, 875 (5th Cir.1991). However, any claims of work-product protection are governed by Rule 26(b)(3) of the Federal Rules of Civil Procedure. *Id.*; *see also* 6 Moore's Federal Practice, § 26.70[7] (Matthew Bender 3d ed.)(work-product doctrine is governed by the federal standard, even in diversity cases).

at p. 5). Importantly, TBC takes the position that this Article creates a <u>stand-alone</u> privilege, separate and independent of the attorney-client or work-product privileges.

The Court does not read the Article that way. At the initial hearing, the Court pressed TBC's counsel to explain how the text of Article 506(B)(3) could be read to create an independent, stand-alone privilege:

> COURT: . . . I'm going back to the fact that I think the documents have to be privileged in the first instance before you can claim a common interest in that privilege.
>
> MR. HILBERT: But, Judge, in complex litigation like this where there are multiple chains of communication that are being undertaken, when Zurich and AWAC hired those contractors, a privilege existed because they had a legal obligation and a contractual obligation as fiduciaries to Texas Brine.
>
> THE COURT: What privilege existed and who was the holder of it?
>
> MR. HILBERT: Texas Brine had that privilege.
>
> THE COURT: In documents that you have not received?
>
> MR. HILBERT: For documents that affect Texas Brine's defenses and claims, yes.
>
> THE COURT: Affect defenses and claims? What do we call that privilege? What is it?
>
> MR. HILBERT: You call it a common interest privilege.
>
> THE COURT: All right. So you are taking the position that, whether you ever received these documents, you have a common interest privilege in their dissemination to others even when you've never seen them, you didn't ask for them to be created, you didn't hire anybody to create them. There is a privilege floating around, your client's privilege, that attaches to those documents?
>
> MR. HILBERT: In this instance, yes.

(Rec. doc. 2170 at pp. 19-21).

TBC has not cited, and the Court has not located, any cases that interpret the language of Article 506(B)(3) nearly as expansively as TBC does. No matter, because the Court need not look beyond the plain language of the Article to determine that TBC's reading is too broad.

As a threshold matter, the very language of the rule states that only "confidential" communications made "for the purpose of facilitating the rendition of professional legal services to the client" are protected from disclosure under Article 506(B)(3). A communication can only be "confidential" if it is made "outside the presence of third parties for the purpose of giving or obtaining an opinion on the law or legal services." *Scherer v. Latter*, No. 96-CV-4189, 1998 WL 205417 at *2 (E.D. La. 1998) (citing La.Code Evid. Art. 506(B); *In re Shell Oil Ref.*, 812 F.Supp. 658, 660 (E.D. La. 1993); *New Orleans Saints v. Griesedieck*, 612 F.Supp. 59, 62 (E.D. La. 1985), *aff'd*, 790 F.2d 1249 (5th Cir. 1986)). "Communications with attorneys made for purposes other than giving or obtaining an opinion on the law or legal services are not protected by the attorney-client privilege." *Id.* at *4 (citing *Soriano v. Treasure Chest Casino, Inc.*, No. 95–CV-3945, 1996 WL 736962 at *2 (E.D. La. Dec. 23, 1996); *State v. Montgomery*, 499 So.2d 709, 712–13 (La. App. 3rd Cir. 1986); *accord United States v. Bornstein*, 977 F.2d 112, 116–17 (4th Cir. 1992)).

So before a court even looks to whether a common-interest privilege attaches to a communication owing to the identity of the person or entity with whom it is shared, it must determine whether that communication is confidential, *i.e.*, privileged, under Article 506(B) in the first instance. And because it is axiomatic that the that the party seeking to assert the attorney-client privilege has the burden of proving that the privilege is applicable,[5] TBC must

---

[5] *In re Vioxx Products Liab. Litig.*, 501 F.Supp.2d 789, 799 n. 15 (E.D. La. 2007).

establish that the Cost Review Reports were "confidential communications" made "outside the presence of third parties for the purpose of giving or obtaining an opinion on the law or legal services." *Id.* TBC has failed to carry this burden.

First, TBC failed to attach for *in camera* review a single copy of one of the 426 Cost Review Reports so that the Court might determine by reference to the documents themselves whether they bear any of the indicia of privileged communications. It is difficult to imagine how TBC might carry its burden here without providing any of the supposedly privileged documents to the Court for *in camera* review.

Nevertheless, because Vulcan did attach copies of certain reports to its opposition, albeit before they were ostensibly "clawed back" by TBC, the Court has been able to review them. These copies remain in the record under seal and the Court's review of them shows them to be just what they are called – reports of Vertex and HETI's review of certain costs submitted to TBC's insurers for reimbursement. They are, in essence, adjustments of TBC's claims by third-party adjusters. Nowhere in the reports that the Court has reviewed is there anything that could be construed as a communication made "for the purpose of giving or obtaining an opinion on the law or legal services." *See Scherer*, 1998 WL 205417 at *4.

The Vertex report reviewed by the Court states that Vertex's purpose in conducting the review was to offer to Zurich "an opinion on the reasonableness and necessity of the incurred expense" and it specifically disclaims expressing any opinions on coverage or the subject insurance policy. (Rec. doc. 2156-5 (Under Seal)). Similarly, the HETI report reviewed by the Court indicates that HETI was "retained [by AWAC] to provide technical and cost evaluation support relative to incurred expenses for which reimbursement is sought by

8

[TBC]" and, notably, specifically recommends that "you consult with your coverage counsel regarding this recommendation." (*Id.*).

These documents are not privileged. They are adjustment reports provided to TBC's insurers by their contractors to adjust <u>contested</u> claims for reimbursement by TBC. They do not fit any reasonable definition of the type of "confidential communication" that is protected under Article 506(B)(3), as nothing in them amounts to the "giving or obtaining [of] an opinion on the law or legal services." *Scherer*, 1998 WL 205417 at *4.

If the communication is not "confidential" in the first place, it cannot be subject to a "common-interest" privilege under the Article. The plain language of the Article makes that clear. In the absence of contrary authority, TBC asks the Court to consider cases from other jurisdictions, but those cases are not helpful for the very reason that they are not Louisiana cases construing the verbiage of Louisiana's evidentiary rule, which is the starting point for any analysis of attorney-client or common-interest privilege.

Even if the Court's reading of Article 506(B)(3) was wrong and that Article did create a stand-alone privilege, the facts here do not support a finding that such a privilege is applicable. For a common-interest privilege to arise pursuant to that Article, the communications must be made by a client or his lawyer to <u>another lawyer or representative of a lawyer</u>. This Court addressed that very aspect of the rule in *Vintage Assets, Inc. v. Tennessee Gas Pipeline Co., LLC*, explaining:

> In brief, Plaintiffs cite a number of cases that discuss the applicability of [the common-interest] privilege but they gloss over the fuller text of the actual evidence rule in Louisiana that sets forth its limits, Article 506(B)(3). That Article states that a communication is privileged if it is "[b]y the client or his lawyer, or a representative of either, *to a lawyer, or representative of a lawyer*, who represents another party concerning a matter of common interest." LSA-C.E. Art. 506(B)(3)(emphasis added).

9

> The subject communication, Document 7, was between the representative of one client (Fatzer) and the representative of a different client (de la Vergne), <u>not de la Vergne's lawyer</u>. Article 506(B)(3)'s protection does not extend to such a communication.
>
> *Vintage Assets, Inc. v. Tennessee Gas Pipeline Co., LLC*, No. 16-CV-0713, 2017 WL 2812967 at *5 (E.D. La. Jun. 28, 2017) (emphasis added and in original).

Courts around the country have similarly justified limiting the application of a "common-interest" privilege. *See, e.g., In re Teleglobe Communications Corp.*, 493 F.3d 345, 365 (3rd Cir. 2007)("Because the common-interest privilege is an exception to the disclosure rule, which exists to prevent abuse, the privilege should not be used as a post hoc justification for a client's impermissible disclosures. The attorney-sharing requirement helps prevent abuse by ensuring that the common-interest privilege only supplants the disclosure rule when attorneys, not clients, decide to share information in order to coordinate legal strategies."); *United States v. Bay State Ambulance and Hosp. Rental Serv. Inc.*, 874 F.2d 20, 28 (1st Cir. 1989)(explaining that the common interest doctrine serves to protect the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel.); *Transmirra Prod. Corp. v. Monsanto Chemical Co.*, 26 F.R.D. 572, 578 (S.D. N.Y 1960) (holding that it is the exchange of protected material among attorneys with identical litigation perspectives that the common legal interest doctrine seeks to protect from pretrial discovery).

At the initial hearing on this motion, the Court questioned TBC's counsel on the routing of the Cost Review Reports. As mentioned earlier, counsel explained that when the

reports were routed to TBC from Zurich and AWAC, they went first to Bruce Martin (a non-lawyer) who is said to have then forwarded them to TBC's counsel. (Rec. doc. 2170 at p. 14). This activity is not protected under Article 506(B)(3), even if the underlying document <u>was</u> privileged. The reports themselves bear no indications that they were exchanged among attorneys with identical litigation perspectives to "coordinate legal strategies,"[6] or to advance a "joint defense effort or strategy that has been decided upon and undertaken by the parties and their respective counsel."[7]

Finally, the Court briefly addresses TBC's argument that the documents might be protected as work-product. First, as the proponent of said privilege claim, TBC has failed to establish that the "primary motivating purpose" behind creation of the reports was to aid in future litigation, as required by well-established Fifth Circuit precedent. *See United States v. Davis*, 636 F.2d 1028, 1040 (5th Cir. Unit A), *cert. denied*, 454 U.S. 862, 102 S.Ct. 320 (1981)(citations omitted)(emphasis added); *accord In re Kaiser Alum. & Chem. Co.*, 214 F.3d 586, 593 (5th Cir. 2000), *cert. denied*, 532 U.S. 919, 121 S.Ct. 1354 (2001). Moreover, because TBC alone is claiming a privilege here and the work-product privilege could not, under these facts, inure to <u>its</u> benefit as a third party to the creation of the subject documents, TBC's claim could only succeed if it could establish that the common-interest privilege also applied. This it cannot do, for the reasons discussed at length above.

B. <u>Waiver</u>

Even if the Court were to find that the "common-interest" privilege somehow operated to shield these documents, the record here clearly supports Vulcan's argument that

---

[6] *Teleglobe Communications*, 493 F.3d at 364.
[7] *Bay State Ambulance*, 874 F.2d at 28.

any privileges have been affirmatively waived by TBC's serial production of the documents over the course of many years.

As noted, Vulcan points out in its brief that TBC has been producing Cost Review Reports to Vulcan for years. When Vulcan made this argument in its opposition to TBC's motion, TBC filed a reply brief suggesting that it only "learned" of the "inadvertent production" of these documents when its lawyers read Vulcan's opposition memorandum. (Rec. doc. 2169). Indeed, TBC's counsel reiterated this position at the hearing on this motion, claiming that TBC first "found out" that Cost Review Reports had been produced when counsel read Vulcan's brief. (Rec. doc. 2170 at pp. 27-28).

Accordingly, TBC urged the Court in its reply memorandum and at the hearing to undertake the five-part test set forth in *Alldread v. City of Grenada.*[8] In its supplemental memorandum, TBC correctly pointed out that the waiver analysis required after inadvertent disclosure is now codified in Federal Rule of Evidence 502 and urged the Court to find, pursuant to that Rule, that it had not waived any privileges by producing 426 versions of the Cost Review Reports throughout the litigation. (Rec. doc. 2172).

In its supplemental memorandum, TBC cited the applicable Rule of Evidence:

> The following provisions apply, in the circumstances set out, to disclosure of a communication or information covered by the attorney-client privilege or work-product protection. . . .
>
> **(b) Inadvertent Disclosure**. When made in a federal proceeding or to a federal office or agency, the disclosure does not operate as a waiver in a federal or state proceeding if:
>
> > (1) the disclosure is inadvertent;
> > (2) the holder of the privilege or protection took reasonable steps to prevent disclosure; and

---

[8] 988 F.2d 1425 (5th Cir. 1993).

(3) the holder promptly took reasonable steps to rectify the error, including (if applicable) following Federal Rule of Civil Procedure 26(b)(5)(B).

(Rec. doc. 2172) (citing Fed. Rule Evid. 502(b)).

Critically, before going on to cite the Advisory Committee notes to the Rule, TBC incorrectly suggests that "[t]he Advisory Committee Notes to Federal Rule of Evidence 502 identify a multi-factor test for courts to consider <u>whether there has been "inadvertent disclosure</u>[.]" (*Id.*). This is most assuredly not what the Rule's multi-factor test is designed to determine. Rule 502's test is <u>not</u> designed to determine whether a disclosure is inadvertent – its purpose is to determine whether an inadvertent disclosure should result in waiver. These are two very different questions, as we will see below.

TBC asks the Court to employ the entire multi-part test[9] to answer whether its years-long production of Cost Review Reports was "inadvertent." The text of the Rule, the Advisory Committee Notes, and the cases decided prior to the Rule's creation all make it clear to the Court that the analysis should be undertaken if and only if the Court finds the disclosure to be actually inadvertent in the first place.

The Rule lists three conjunctive factors, all of which must be present for a disclosure not to operate as a waiver – the very first is "the disclosure was inadvertent." Fed. Rule Evid 502(b).

---

[9] Actually, it continues to ask the Court to employ the five-part test from *Alldread* for this purpose, despite the subsequent inclusion of Rule 502 in the Federal Rules of Evidence, because it believes such cases pre-dating the Rule to be "helpful for considering if a production of privileged documents was inadvertent under Rule 502." (Rec. doc. 2172 at p. 2). Leaving aside that neither the pre-Rule cases nor the Rule itself are intended to help a court consider whether a production was inadvertent, the Court sees no need to stray from the Rule and the Advisory Committee notes to go back in time for help in determining whether there has been a waiver in this case.

In this case, no amount of argument or rationalization will convince the Court that TBC's years-long production of Cost Review Reports to Vulcan was inadvertent. Black's Law Dictionary defines "*inadvertent disclosure*" as "[t]he accidental revelation of confidential information, as by sending it to a wrong e-mail address or by negligently allowing another person to overhear a conversation"[10] and the Merriam-Webster Thesaurus includes as synonyms of "*inadvertent*" such terms as "*accidental*," "*unintended*," and "*unpremeditated*."[11]

The Advisory Committee Notes to Rule 502 further bolster the Court's conclusion. The committee explains the genesis of Rule 502 in its "Description of the Process Leading to the Proposed Rule":

> The Judicial Conference Rules Committees have long been concerned about the rising costs of litigation, much of which has been caused by the review, required under current law, of every document produced in discovery, in order to determine whether the document contains privileged information. In 2006, the House Judiciary Committee Chair suggested that the Judicial Conference consider proposing a rule dealing with waiver of attorney-client privilege and work product, in order to limit these rising costs. The Judicial Conference was urged to proceed with rulemaking that would:
>
> •protect against the forfeiture of privilege when a disclosure in discovery is the <u>result of an innocent mistake</u>; and
> •permit parties, and courts, to protect against the consequences of waiver by permitting disclosures of privileged information between the parties to litigation.
>
> Fed. R. Evid 502, Adv. Comm. Notes. (emphasis added).

---

[10] *Inadvertent disclosure*, <u>Black's Law Dictionary</u> (11th ed. 2019).
[11] Merriam-Webster Thesaurus, https://www.merriam-webster.com/thesaurus/inadvertent.

It defies credulity to suggest that the serial production of 426 reports over the course of four years could be viewed as inadvertent, accidental, unpremeditated, or an "innocent mistake." Someone, somewhere repeatedly made conscious decisions over time to produce these reports to Vulcan – at least 23 separate times according to Vulcan; TBC's suggestion that it only "learned" of those productions within the last few weeks is inconsistent with these plain facts.

## IV. CONCLUSION

The Vertex and HETI Cost Review Reports previously produced and sought via the subject subpoena are not subject to any privilege – attorney-client, work-product, or common-interest. Even if some privilege had once attached to the reports, any such privilege was waived by TBC when it produced hundreds of those reports to Vulcan throughout this litigation. *See, e.g.*, *Nguyen v. Excel Corp.*, 197 F.3d 200, 207 (5th Cir. 1999) (holding that disclosure of significant confidential communications waives the privilege as to the entire subject matter) (citing *United States v. Woodall*, 438 F.2d 1317, 1324 (5th Cir. 1970) (en banc)). TBC's recent effort to claw back those documents is therefore ineffective and the Court finds that Vulcan need not return or destroy the documents as demanded by TBC. Moreover, the Court denies TBC's motion for protective order and orders that the subpoenas issued to Vertex and HETI shall be responded to within 15 days of this Order.

New Orleans, Louisiana, this 17th day of October, 2019.

 MICHAEL B. NORTH
 UNITED STATES MAGISTRATE JUDGE

15