UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| LISA T. LEBLANC, ET AL. | CIVIL ACTION |
| VERSUS | NO: 12-2059 AND CONSOLIDATED CASES |
| TEXAS BRINE CO., LLC, ET AL. | SECTION: "A" (5) |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**REF: 13-5227 (Sanchez—Saizon)**

This bellwether case was tried to the Court sitting without a jury on December 3-4, 2019, as to the issue of damages only. Having considered the testimony and evidence at trial, the arguments of counsel, and applicable law, the Court now enters the following Findings of Fact and Conclusions of Law in accordance with Federal Rule of Civil Procedure 52(a). To the extent that any finding of fact may be construed as a conclusion of law, the Court hereby adopts it as such. To the extent that any conclusion of law constitutes a finding of fact, the Court adopts it as such.

**I.  FINDINGS OF FACT**

Beginning in 1982, the defendant, Texas Brine Co., LLC, operated a brine well, known as the Oxy Geismar #3 Well, to produce brine from the Napoleonville Salt Dome in Assumption Parish, Louisiana. The brine was supplied to Legacy Vulcan, LLC and Occidental Chemical Corporation for use at their facilities in Geismar, Louisiana.

On August 3, 2012, a sinkhole (hereinafter "the Sinkhole") appeared in the Bayou Corne area of Assumption Parish in the vicinity of the Oxy Geismar #3 cavern, which is located at the Napoleonville Salt Dome. The cause of, or liability for, the Sinkhole is not at issue in this bellwether damages trial.

The plaintiff, Peggy Saizon (at times referred to simply as "Saizon"), owns a 33.25 acre tract of land located in Section 40, Township 12 South, Range 13 East, in the Parish of Assumption, Louisiana in the Bayou Corne area near the Napoleonville Salt Dome (hereinafter "the Saizon Tract"). Saizon is a member of the Sanchez class, which is a putative class of persons who were owners of uninhabited or undeveloped land within a two mile radius of the center of the Sinkhole.

Ms. Saizon's husband purchased the Saizon Tract in 1998 for $10.00 and other good and valuable consideration. Mr. Saizon passed away in February 2008. The ownership rights to the Saizon Tract were tied up in his succession proceedings until February 2013 when Peggy Saizon became sole owner of the property.

The Saizon Tract is now and has always been undeveloped and uninhabited. It is vacant swamp land and presumably would be considered "wetlands" by the federal government. It has no structures, utility lines (such as electricity, water, or sewerage), buildings, or improvements upon it. Even if the federal government were willing to issue a permit to develop the Saizon Tract, the cost to develop wetlands property like the Saizon Tract is significant and often cost prohibitive.

Saizon has never lived on the Saizon Tract or in Assumption Parish. Saizon has never had plans to build a home on the Saizon Tract or live on it.

The Saizon Tract is not waterfront property, which would be much more usable and attractive to potential buyers, and therefore more valuable. Only a small portion of the Saizon Tract actually fronts on the bayou.

The Saizon Tract was originally 35 acres in size. In 2000 and 2005, Mr. Saizon sold off two sections of the Saizon Tract to adjacent land owners for $3500 (1.59 acres) and $3000 (.01 acre) each.

While Mr. Saizon was still alive one of the adjacent neighbors (Mr. Daigre) was anxious to purchase a 70' by 40' section of the Saizon Tract for $3,000. The sale was delayed initially by local land regulations, and later by Mr. Saizon's death and the pendency of his succession proceedings which did not conclude until 2013. By then the Sinkhole had occurred and Ms. Saizon lost all contact with the potential buyer, who presumably no longer owns or lives on the adjacent property.

Given Mr. Daigre's diligence and tenacity in trying to purchase the land prior to the Sinkhole, the loss of that $3000 sale is attributable to the Sinkhole.

The Saizon Tract is adjacent to (north of) the former Bayou Corne community of residences. Mr. Saizon was one of the developers of this subdivision. Pursuant to a class action settlement after the Sinkhole, Texas Brine purchased over 150 residences in the Bayou Corne community. Texas Brine does not have any plans to develop the property that was once the Bayou Corne community. The former community now mostly consists of abandoned homes although seven homeowners refused to evacuate and continue to live there. The roads in and out of the former community are no longer maintained and some of those bad roads are adjacent to the Saizon Tract.

Because of the Sinkhole and the devastation that it caused to the adjacent Bayou Corne community, it is now highly unlikely that Saizon will receive any more offers to purchase small sections of the Saizon Tract.

In 2018 when Saizon tried to visit her property she encountered ominous signage warning the public not to enter without proper PPE (personal protective equipment) because demolition work was in progress. Saizon assumed that those signs were temporary and related to the demolition of nearby property. The area gave a sense of dystopia.

The Saizon Tract is located within the former mandatory evacuation area defined in

connection with the Sinkhole. All evacuation orders issued in connection with the Sinkhole were lifted as of October 7, 2016. There are currently no governmentally-imposed restrictions on the use of the Saizon Tract. The Sinkhole has not caused any long term changes to the way that the Saizon Tract can be used. Saizon can use her property now the same way that she could have used it before the Sinkhole.

The Sinkhole and its containment berm do not encroach the Saizon Tract. The Sinkhole did not cause permanent or temporary physical damage to the Saizon Tract. The property remains quite beautiful.

Mr. Saizon was an avid sportsman and he regularly used the Saizon Tract for recreational purposes. Although both Saizons enjoyed fishing and boating in the Bayou Corne waterways, and had built a camp in the area, none of those activities involved the Saizon Tract. After her husband's death Ms. Saizon never used the Saizon Tract for her own use. Before the Sinkhole event, 2010 was most likely when Ms. Saizon had last visited the property. Prior to October 7, 2016 (when the evacuation order was lifted) Ms. Saizon would not have used the property for her own use.

Saizon had hoped that the Saizon Tract could be a lucrative part of her retirement plan like for instance if a company had wanted to buy or lease the land from her for oil and gas exploration. But in all the years that the Saizons owned the tract prior to the Sinkhole they had never received such an offer. There was no evidence offered to suggest that the Saizons had obtained timber leases or offers to lease the land for hunting prior to the Sinkhole nor that the land could no longer be used for those purposes because of the Sinkhole.

The Sinkhole has not gone away although it has naturally filled with sediment and water. The Sinkhole now looks like a lake within a containment berm. There are no plans to

remove the containment berm; it will remain in place indefinitely. The containment berm has a 50-100 year life expectancy. There are 110 acres inside of the containment berm. The Sinkhole itself comprises about 57 acres. The berm is monitored daily by Texas Brine to ensure that the site remains stable and that the Sinkhole does not grow in size.

There has been no "bubbling" observed in the center of the Sinkhole since 2016 or 2017. The last "sloughing," which is a phenomenon where the Sinkhole's sides try to reach their natural state of repose by falling into the Sinkhole, was observed in March 2014. There is no data to suggest that the Sinkhole is unstable at this time.

There have been no non-Texas Brine property sales within the two mile area surrounding the Sinkhole since it occurred in August 2012. It is not clear whether any land owners have actually tried to sell their land and have been unable to do so.

Even prior to the Sinkhole there were very few property sales in the area of land with a similar use profile (recreational wetlands) to that of the Saizon Tract because there is usually not an abundance of sales for wetlands property. It is not clear whether the pre-Sinkhole lack of sales was due to a dearth of buyers in the marketplace or because the land owners would not sell their property.

The Saizon Tract is less valuable today than it was prior to August 3, 2012 because of the Sinkhole. Part of the diminution in value is attributable to the fact that an adjoining community that once thrived there was removed suddenly and without warning from the area giving an eerie, post-apocalyptic impression to those who now visit the area. The Saizon Tract is in an area that is not attractive for anyone to live in or visit anymore.

The Saizon Tract is also less valuable today than it was prior to the Sinkhole because of the stigma associated with the catastrophic emergence of the Sinkhole and its aftermath. Saizon's land expert, Mr. Andrew Marshall, was convincing when he explained

that the marketplace for real estate is not necessarily made up of people "educated" about the actual facts regarding the Sinkhole as it exists today. The marketplace of potential buyers is not made up of seismologists and geologists who understand what the objective evidence means in terms of potential future risk from the Sinkhole. It is not implausible that potential buyers who see the videos of the sloughing that occurred in the aftermath of the Sinkhole—and the Court has no doubt that they would see those videos because they are easily accessible to everyone on the internet—might hesitate to purchase land in the area. They certainly will not pay the pre-Sinkhole or unimpaired price for the land.

Perhaps with the passage of time the negative perceptions associated with the Sinkhole will fade and any lingering fear will be considered unreasonable or irrational. But right now the Sinkhole is still a relatively recent occurrence and in this respect the Sinkhole is still "ongoing" in terms of the stigma damages it has caused to the property in the vicinity. No one knows how long the stigma associated with the Sinkhole will negatively affect the value of the Saizon Tract. Even if the containment berm continues to function without incident well into the future it will always remain in place as a grim reminder of what occurred in the Bayou Corne area.

The post-Sinkhole or impaired value of the Saizon Tract is 40% of its pre-Sinkhole value. In other words, the value of the Saizon Tract has been reduced by 60% because of the Sinkhole. The 10% percent stigma reduction proposed by Texas Brine's land expert does not adequately account for the negative impact of the Sinkhole on the market value of the Saizon Tract. The stigma impacts related to the Sinkhole did not end when the evacuation order was lifted.

Texas Brine's land expert, Mr. Michael Truax, was convincing when he opined that the unimpaired or pre-Sinkhole price per acre of the Saizon Tract should be valued at

$1350 per acre or $45,000 for the entire Saizon Tract. The highest or best use of the Saizon Tract prior to the Sinkhole was use for recreational activities such as hunting and fishing, and habitat conservation. The property was not valuable waterfront property and there was no evidence to suggest that oil companies, timber companies, or even hunters had been interested in leasing the land prior to the Sinkhole. The only "income" that the Saizons had ever received from the property was the occasional selling off of small sections to adjoining neighbors but even that only occurred three times (including the Daigre sale that was not consummated because of the Sinkhole) between 1998 when Mr. Saizon purchased the property and August 2012 when the Sinkhole emerged. Whether any other neighbors would have been similarly interested in buying small sections of the Saizon Tract is speculative. The best use for the Saizon Tract was not for investment property even if that is what Ms. Saizon had hoped for. The Sinkhole did not affect the use profile of the Saizon Tract.

Mr. Truax credibly explained why he used the specific comparable sales that he relied upon when coming up with the unimpaired price per acre of the Saizon Tract. As a general rule in property valuation of wetlands, the more wetlands you buy the less the per acre value. But the converse of that proposition is also true as demonstrated by the fact that adjoining neighbors had purchased small pieces of the Saizon Tract for prices that equated to $2200, $300,000, and $45,000 per acre. Those skewed prices do not drive up the price per acre for all of the other acres in the tract that did not adjoin a neighboring property.

## II. CONCLUSIONS OF LAW

The Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d). Venue is proper in this district and is not contested.

The proper measure of the damages sustained by the Saizon Tract as a result of the

Sinkhole is determined by the difference between the property's unimpaired (pre-Sinkhole) and impaired (post-Sinkhole) value. The pre-Sinkhole value of the Saizon Tract was $45,000.00. Applying the 60% stigma effect factor means that the Sinkhole reduced the value of the Saizon Tract by $27,000.00. This is the amount that Saizon is entitled to recover for diminution of value to her land.

For loss of use damages the Court awards Saizon the $3,000 that she would have made from the Daigre sale had the Sinkhole not occurred.

Saizon is not entitled to greater loss of use damages because she did not use the property prior to the Sinkhole, and she did not establish that she would have used the property but for the mandatory evacuation order that was in place until October 7, 2016. *Carrol v. State Farm Ins. Co.*, 427 So. 2d 24, 27 (La. App. 3rd Cir. 1983). This case is distinguishable from *Level 3 Communications, LLC v. Toomer Electrical Co.*, 557 F. Supp. 2d 745 (E.D. La. 2008), wherein the plaintiff had incurred extra cost in order to build redundancy into its communication system.

The Fourth Circuit allows a plaintiff to recover loss of use damages, typically measured by a fair rental figure, even if the plaintiff does not actually rent substitute property. *Chriss v. Manchester Ins. & Indem. Co.*, 308 So. 2d 803, 806 (La. App. 4th Cir. 1975); *Fie, LLC v. New Jax Condo Assoc., Inc.*, 241 So. 3d 372 (La. App. 4th Cir. 2018). But in this case the evidence did not establish that Saizon's normal use of the property was restricted or disrupted in any manner by the Sinkhole.

Saizon is entitled to judgment in her favor totaling $30,000.00.

The Court cannot enter a final judgment against Texas Brine until the percentage of Texas Brine's fault for the Sinkhole is determined. As the Court has already explained when ruling on the parties' collateral estoppel motions, a plaintiff like Saizon may try the issue of

Texas Brine's liability for the Sinkhole anew to a federal jury or may opt to accept the 35% fault allocation that was determined in state court if that decision has not been overturned on appeal. *LeBlanc v. Texas Brine Co.*, No. 12-2059, 2018 WL 1901647 (E.D. La. Apr. 20, 2018).

A status conference with the Court and counsel for Saizon and Texas Brine is set for **Thursday, February 20, 2020, at 10:45 a.m.** to discuss the next step in Saizon's case against Texas Brine. This status conference will take place in chambers.

February 4, 2020

_____
JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE